934 A.2d 450

**Mark Andrew MONA**

v.

**MONA ELECTRIC GROUP, INC., et al.**

**No. 2609, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 13, 2007.

Reconsideration Denied Nov. 26, 2007.

674

676

678

680

682

Timothy F. Maloney (Veronica Byam Nannis, Kevin S. Dale, on the brief), Greenbelt, for appellant.

Steven M. Schneebaum (Davis S. Panzer, on the brief), Washington, DC, for appellee.

Panel: MURPHY, C.J., SALMON, DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Prince George's County, Mark Mona ("Mark") brought suit for declaratory and injunctive relief and damages against his father, Vincent Patrick "Cap" Mona ("Cap"); Mona Electric Group, Inc. ("MEG" or "the company"); and five former and present directors of MEG and one employee, all of whom were voluntarily dismissed before trial. The complaint stated eleven counts. In the year and a half between the initial filing date and trial, it was amended three times, adding and deleting various claims and defendants. Before trial, all of the counts in the third amended complaint were disposed of by motion, except: 1) breach of fiduciary duty against Cap; 2) fraud against Cap; 3) unjust enrichment against MEG; 4) a derivative action against MEG; and 5) a declaratory judgment action.[1]

The case was tried to a jury for six days. At the conclusion of Mark's case-in-chief, the court granted Cap's motion for judgment on the breach of fiduciary duty and fraud counts and MEG's motion for judgment on the derivative action.[2] The claims against MEG for unjust enrichment and declaratory judgment survived. Over MEG's objection, the unjust enrichment claim was submitted to the jury for decision. The jury returned a verdict in favor of Mark and against MEG for $1,241,000. Thereafter, the court dismissed the declaratory judgment claim as moot.[3]

In a timely filed motion for judgment notwithstanding the verdict ("JNOV"), MEG argued that the unjust enrichment claim should have been decided by the court, not by a jury,

---

**1.** The pretrial rulings are not challenged in this appeal.

**2.** The court's rulings on the fraud claim and the derivative action are not being challenged on appeal.

**3.** The ruling dismissing the claim for declaratory relief also is not being challenged on appeal.

and was barred by the doctrine of judicial estoppel in any event. In support of its estoppel argument, it pointed out that Mark had admitted in his testimony at trial to conduct that was an offense under the federal tax laws. Specifically, Mark had testified that he had taken a tax write-off on his individual federal return based upon his personal guarantee of advances MEG had made to Mona Energy, Inc. ("Mona Energy"), a subsidiary wholly owned by Mark; but he also testified that he had never personally guaranteed those advances. The advances only could be used by Mark to support the tax write-off if he had personally guaranteed them.

Of the damages awarded by the jury, $581,789 was to compensate Mark for MEG's having deducted, from his share of a dividend the company declared in March 2005, sums the company had advanced to Mona Energy and, according to the company, that Mark had guaranteed. During the hearing on MEG's JNOV motion, the court, following up on MEG's assertion that Mark had admitted to tax fraud, asked whether the "clean hands" doctrine should preclude Mark from recovering the $581,789. The court decided to continue the hearing and give the parties an opportunity to brief the clean hands issue, which they did.

At the continued hearing, the trial judge entertained argument of counsel and then ruled that Mark had not come to court with clean hands with respect to the $581,789 he had sued to recover as having been wrongly deducted from his share of the March 2005 dividend. On that ground, the court reduced the judgment by $581,789. Judgment in favor of Mark for $659,211 was entered on December 7, 2005.

Immediately after entry of the December 7, 2005 judgment, Mark demanded that the full amount of the judgment, plus postjudgment interest, be paid. On December 19, 2005, MEG paid the judgment and a sum of money representing postjudgment interest from December 7 to December 19. Mark insisted that he was owed postjudgment interest from the date of the jury verdict to December 19, and refused to file an order of satisfaction. Ultimately, the trial court ruled that

MEG was responsible for paying postjudgment interest beginning from the date of the verdict. MEG then paid that amount, and Mark filed an order of satisfaction.

Mark and MEG each noted timely appeals. Because Mark's notice of appeal was filed first, his appeal was designated as such and MEG's was designated as a cross-appeal.

In his appeal, Mark poses two questions for review, which we have reordered and reworded: [4]

 I. Was the evidence in Mark's case-in-chief legally sufficient to support a verdict in his favor for breach of fiduciary duty against Cap?

 II. Did the trial court err by *sua sponte* reducing the jury's damages award pursuant to a motion for JNOV?

In its cross-appeal, MEG poses six questions, two of which are essentially the same as Mark's questions. The four independent cross-appeal questions are:

 I. Should Mark's appeal of the reduction of the damages award on the unjust enrichment claim be dismissed under the acquiescence doctrine?

 II. Did the trial court err by submitting the unjust enrichment claim to the jury for decision, instead of deciding it itself?

 III. Was Mark judicially estopped to bring his claim for unjust enrichment?

---

**4.** Mark words his questions for review as follows:

"1. Did the trial court err by *sua sponte* reducing Appellant's jury verdict pursuant to a motion for Judgment Notwithstanding the Verdict and a finding of extrinsic fraud?

2. Did the trial court err in granting former defendant Cap Mona's Motion for Judgment on Appellant's breach of fiduciary duty count when there was sufficient evidence for the issue to go to the jury?"

MEG words its questions for review on cross-appeal in the form of the following arguments:

"1. There is no right to a jury trial for unjust enrichment

2. The unjust enrichment count was also barred by the doctrine of judicial estoppel.

3. When a trial court enters a JNOV, the earlier judgment is set aside, and post-judgment interest runs from the JNOV."

IV. Did the trial court err by awarding post-judgment interest from the date of the original judgment instead of from the date of the revised judgment?

For the reasons discussed below, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

MEG is an ordinary business corporation with its principal place of business in the Prince George's County town of Clinton. It is the current iteration of the business first organized and incorporated in 1966 as the Mona Electric Company, Inc., and later divided into Mona Electrical Construction, Inc., and Mona Electrical Service, Inc. MEG is a Subchapter S corporation under the Internal Revenue Code.

Cap Mona is the founder, President, and Chairman of the Board of Directors of MEG. During the time relevant to this case, he owned 50.6% of the shares of stock in MEG, including all of the voting shares.

Mark is one of five children of Cap and Susan Mona. Beginning in the 1980's, he was president of Mona Electrical Construction, Inc., and his older brother, Andy, was President of Mona Electrical Service, Inc. Cap was the chief executive officer ("CEO") of both companies. In November 1992, Andy died of melanoma. Thereafter, Mark became president of both companies. In the late 1990's, the companies were combined to form MEG.

From the mid–1990's until April 2002, Mark served as MEG's CEO. During that time, he ran the company's day-to-day operations while Cap served in an advisory role.

Cap and Susan were the original sole stockholders in the companies that later became MEG. Beginning in 1992, after Andy's death, Susan began making gifts of her stock to Mark. The gifts were made with Cap's knowledge and approval.

From 1997 through 2001, Cap and Mark tried to find an outside purchaser for MEG. When third-party sale negotiations proved unsuccessful, they explored the option of Mark's

buying out Cap's shares in the company. Mark made various offers to purchase Cap's shares, which Cap rejected. As the negotiations continued, Cap and Mark's relationship grew increasingly hostile and deteriorated.

In February 2002, Cap, through counsel, informed Mark in writing that, if he could not meet the price Cap was demanding for his interest in MEG, Cap would "return to the business and exercise the rights he has as the owner of the voting stock of the business." Mark and Cap were not able to agree on a price. In April 2002, the Board of Directors fired Mark, removed him as a director, and elected Cap President and CEO of the company.

A few months later, Susan Mona was diagnosed with cancer.

In 2003, Susan still owned 25% of the stock in MEG. At some point before September of that year, she gave all her remaining stock to Mark, upon his promise that he and Cap would mend their relationship. With that gift, Mark became the only stockholder in MEG other than Cap, having acquired 49.4% of the stock in the company through the gifts from his mother. Susan Mona died in November 2003.

On February 26, 2004, in the Circuit Court for Prince George's County, Mark filed the instant suit. He alleged among other things that the company had failed, wrongly, to declare a dividend for three years, to his detriment as a shareholder and contrary to agreements that a dividend would be declared. Specifically, Mark alleged that on February 13, 2001, the shareholders agreed in writing to issue a "regular dividend" of $950,000, but the company reneged on that agreement; and that on December 27, 2001, the Board voted to issue a $210,000 dividend to Mark, which the company then failed to pay.

MEG filed a counterclaim that included counts for breach of contract and fiduciary duty. It alleged that Mark had improperly taken personal advances from the company that he had not repaid and had taken advances from the company on behalf of Mona Energy, which he also had failed to repay. In support, MEG alleged that the very documents Mark was

relying upon in asking the court to order it to pay promised dividends contained promises by Mark that whatever dividends were issued would be used to repay the advances he had taken from the company, personally and on behalf of Mona Energy.

The case was specially assigned and designated a June 28, 2005 trial date.

Mark filed an amended complaint, and later a second amended complaint, by which he eliminated and added certain individual defendants, all of whom were no longer in the case by the time of trial and are not parties to this appeal. The appellees filed an amended counterclaim. In rulings on motions to dismiss, the court narrowed the scope of several of Mark's claims. As pertinent to the issues on appeal, on January 7, 2005, the court dismissed MEG from the derivative action. The appellees then filed a second amended counterclaim.

On February 4, 2005, in a second motions hearing, the court limited Mark's breach of fiduciary duty claim to Cap and limited a claim Mark had made against individual directors for payment of a dividend, ruling that individual directors (as opposed to the company) did not have a duty to a minority shareholder with respect to dividends.[5]

The parties each moved for summary judgment.

In the meantime, on March 3, 2005, the MEG Board of Directors declared a dividend of $3.2 million dollars. The company deducted from Mark's share of the dividend the sums the Board had determined, and was alleging, he owed MEG. Specifically, after apportioning the dividend between Mark and Cap according to their percentage ownership of shares, MEG deducted $1,531,590 dollars from Mark's portion, as follows:

- $581,789, for one-half of the balance due on advances to Mona Energy (a subsidiary business wholly owned by

---

5. Mark has not challenged that ruling on appeal.

Mark) that MEG claimed Mark and Cap had personally guaranteed;

- $290,590, for the balance due on loans from MEG to Peak Trader, a business venture owned by Mark;

- $547,786, for personal advances that Mark had taken from MEG but had not repaid; and

- $111,425, for interest on the money borrowed.

After these deductions, Mark received $49,219. (Prior to the issuance of the dividend, Cap had repaid his $581,789 share of the advances MEG had paid to Mona Energy.)

On April 26, 2005, Mark filed a third amended complaint. He added an unjust enrichment count against MEG, claiming that, to its own benefit, the company had wrongly deducted the above sums from his share of the March 2005 dividend. His breach of fiduciary duty count was against Cap only; and his derivative action was against Cap and another individual defendant who later was voluntarily dismissed. In his declaratory judgment count, Mark sought a finding that the sums deducted from his share of the March 2005 dividend were improperly taken by the company.

With the payment of the dividend, and the deduction from Mark's share of the monies that MEG had counterclaimed to recover, MEG moved for leave to dismiss its counterclaim, which was granted over Mark's objection.

In the meantime, the discovery phase of the litigation had been in progress. In deposition, Mark refused to answer any questions about the damages he was claiming to have suffered as a consequence of Cap's alleged breach of fiduciary duty, stating that damages would be the subject of testimony by an accountant expert witness. No report of that expert witness was produced, however, and Mark later canceled the expert's deposition and withdrew him. That prompted the appellees to move for sanctions on the ground that Mark had effectively prevented them from gaining any information about the damages he was seeking to recover. The court granted the motion, ruling that Mark could not testify about any claimed

damages, except with respect to the sums that were deducted from his share of the March 2005 dividend.[6]

The court ruled in part on the motions for summary judgment in the month before trial, and ruled on the remaining summary judgment issues immediately before trial. Among other things, the court reiterated its ruling that the obligation to pay a dividend is that of the corporation, not of an individual director, officer, or shareholder, and arises when a dividend is declared; and the power to declare a dividend rests in the directors of the company. Accordingly, Cap did not owe any duty to Mark with respect to the payment of dividends.[7]

In support of his motion for summary judgment on the breach of fiduciary duty claim, Cap argued that Mark had no admissible evidence of damages to support that claim. The evidence generated in discovery and presented on the summary judgment record showed that the damages Mark was seeking to recover on this count were 1) an equal share of the salary and bonuses the company had paid to Cap from 2001 forward, on the theory that those monies were "constructive dividends" that Mark, as the other shareholder in the company, should have received as well; 2) an equal share of the reimbursements Cap received from the company during that same time period, on the theory that they were improper diversions of corporate monies to Cap; and 3) the monies that Mark claimed were improperly deducted from his share of the March 2005 dividend.

The trial court granted summary judgment in favor of Cap, in part, on the issue of damages for breach of fiduciary duty. It ruled that, to the extent Mark was seeking damages in the form of a dividend that he was claiming should have been declared and paid to him, or in the form of deductions he was claiming were wrongly taken from the March 2005 dividend, any duty owed to Mark was a duty of the corporation, not of Cap; therefore, those damages were not recoverable against

---

6. The sanction ruling has not been challenged on appeal.

7. That ruling is not challenged on appeal.

Cap. (Also, the latter damages were being sought against the company by Mark in his unjust enrichment claim.) The court denied summary judgment, however, with respect to damages for improper payment to Cap of excessive salary and bonuses and allegedly improper reimbursements.

A jury was selected and trial began on June 28, 2005. Mark's theory of recovery was that Cap and the Board of Directors had understated MEG' s earnings in 2001, 2002, and 2003 in order to avoid having to declare a dividend; that from 2002 forward Cap was paid an inflated salary and bonuses; that, when Cap returned to manage the company in April 2002, he replaced the existing Board of Directors with people aligned with him and used the new Board and his 100% ownership of the voting shares in MEG to "freeze out" Mark, to the detriment of both Mark and the company; and that, when the Board finally declared a dividend three months before trial, it wrongly deducted amounts from his share that he did not owe the company.

Cap's theory of the case was that Mark had neglected the company during his tenure as CEO and that in the wake of Mark's poor management and in the context of a weakening economy it would have been irresponsible for MEG to have declared a dividend before it did; his compensation package was fair and the Board's decisions on that score were made in good faith and therefore were protected from scrutiny by the business judgment rule; Mark had received advances from MEG, including advances paid to Mona Energy, which he had personally guaranteed, and the deductions from Mark's share of the March 2005 dividend were properly made, in order for the company to recover the sums Mark owed it.

As noted above, after the court ruled on motions for judgment, the unjust enrichment claim was submitted to the jury, which returned a verdict in favor of Mark against MEG. It awarded Mark $581,789 for the deduction MEG had taken for the money owed by Mona Energy; $290,590 for the deduction MEG had taken for the money owed by Peak Trader; $547,786 for the deduction MEG had taken for personal ad-

vances allegedly made to Mark, but not repaid; and $111,425 for the deduction MEG had taken for interest on the above amounts. The trial court dismissed Mark's only other claim, for declaratory judgment, as moot. That claim had been narrowed by pretrial motions to concern only the question whether the deductions from Mark's share of the March 2005 dividend were properly made; that exact claim had been resolved by the jury in its decision on the unjust enrichment count.

Ultimately, as we shall discuss, the court granted a partial JNOV in MEG's favor, reducing the amount of damages Mark would receive by the $581,789 awarded with respect to the Mona Energy advances.

We shall furnish additional facts as necessary to our discussion of the issues.

## DISCUSSION

### *APPEAL*

#### I.

##### WAS THE EVIDENCE LEGALLY SUFFICIENT TO MAKE MARK'S BREACH OF FIDUCIARY DUTY CLAIM AGAINST CAP A JURY ISSUE?

###### (a)

Mark contends that the evidence adduced in his case-in-chief was legally sufficient to make his breach of fiduciary duty claim against Cap a jury issue, and therefore the trial court erred by granting a motion for judgment in favor of Cap on that claim.

At trial, in accordance with the court's pretrial rulings, Mark attempted to prove that Cap breached a fiduciary duty to him by taking excessive executive compensation and reimbursements for personal activities. Specifically, Mark sought to prove that Cap had orchestrated the Board's approval of his own grossly inflated compensation package, thereby violating his fiduciary duty, as the majority shareholder, to Mark, as the minority shareholder; and that likewise Cap had obtained

by Board approval reimbursement for expenses that were personal, not business related, in breach of his fiduciary duty to Mark.

At the close of Mark's case-in-chief, Cap moved for judgment on the breach of fiduciary duty claim, making two arguments. First, assuming *arguendo* that Mark had adduced legally sufficient evidence of duty and breach, the evidence showed only that any injury sustained as a result of the breach was to the company, not to Mark, who "ha[d] not shown that he was the owner of any right that might have been violated here." In other words, if excessive compensation and improper reimbursements indeed were paid to Cap, in violation of a fiduciary duty owed by Cap, any injury sustained as a consequence was to the company. On that basis, Cap asserted that any claim to recover any such sums was not a claim personal to Mark, that he could bring directly; rather, it was a claim of the corporation, that Mark only could pursue in the form of a derivative action. Mark had not given the Board the required notice that he was pursuing any such claim derivatively, however. (In Mark's demand letter to the Board, he had not said anything about excess compensation or improper reimbursements to Cap.)

Second, Cap argued that, even if Mark could proceed on the breach of fiduciary duty claim as a direct action, the Board's compensation and reimbursement decisions with respect to Cap were reasonable and made in good faith, and therefore were protected from scrutiny by the business judgment rule; and that Mark had not generated any evidence to the contrary.

In response, Mark countered that he had "standing" to bring a direct action for breach of fiduciary duty against Cap because, as the majority shareholder in a "closely held corporation," Cap owed him, as the minority shareholder, a fiduciary duty. He also maintained that the facts adduced in his case-in-chief were sufficient to support a rational finding that Cap breached that fiduciary duty.

The court granted Cap's motion for judgment on Mark's breach of fiduciary duty claim on Cap's second ground, i.e., the business judgment rule. It reiterated its prior ruling that, to the extent Mark was attempting to recover damages for undeclared or underpaid dividends, MEG, not Cap, owed him a duty of care. The court further determined that the evidence adduced in Mark's case established that all facets of Cap's compensation were "authorized by the Board of Directors" and that the "Business Judgment Rule" permits directors to make such decisions, so long as they act in good faith in doing so. The court found that there was "no evidence before [it] that the judgments made by the Board of Directors . . . were anything other than in good faith" and that, "consequently, it's not up to me to mettle [sic] in the government of the corporate entity; Board of Directors being protected in their decision making process by the Business Judgment Rule."

Having granted the motion for judgment in favor of Cap, on the business judgment rule ground, the court did not address Cap's first argument, that any injury sustained was to the company, not to Mark.

Also at the close of Mark's case-in-chief, the court granted judgment in favor of Cap on the fraud claim, and in favor of MEG on the derivative claim. (As noted above, neither ruling is being challenged on appeal.) In granting the motion on the derivative claim, the court recapitulated the evidence about the written demand Mark had made upon the Board. That demand was made by letter of November 20, 2002, by Mark's lawyer to MEG's lawyer. The court determined that, on its face, the letter did not give notice to the Board that Mark was demanding any remedial action. Accordingly, the evidence was legally insufficient to support a derivative action. In addition, the court ruled that the evidence presented was legally insufficient to show that the company had sustained any damages.

For the reasons we shall explain, we conclude that the trial court correctly granted Cap's motion for judgment on the

breach of fiduciary duty count on the ground that the evidence adduced at trial was legally insufficient to rebut the presumption created by the business judgment rule. We further conclude that the evidence adduced at trial established that the damages Mark was seeking against Cap on the breach of fiduciary duty claim were for an alleged injury to the company, not to himself, and therefore were not recoverable in a direct action by Mark. On that separate basis, Cap was entitled to judgment in his favor on the breach of fiduciary duty claim.

### (b)

As mentioned above, MEG was organized and incorporated in Maryland. Accordingly, Maryland statutory and common law of corporations governs.

■■■■ The shareholders of a corporation are its owners, but not its managers. *Werbowsky v. Collomb,* 362 Md. 581, 599, 766 A.2d 123 (2001). "Except to the extent that a transaction or decision must, by law or by virtue of the corporate charter, be approved by the shareholders, the directors, either directly or through the officers they appoint, exercise the powers of the corporation." *Id.;* Md.Code (1975, 1999 Repl.Vol., 2006 Supp.), § 2–401 of the Corporations and Associations Article ("CAA").

■■■ The directors of a corporation do not own its property; the corporation itself owns it. *Bassett v. Harrison,* 146 Md. App. 600, 609–10, 807 A.2d 695 (2002). Fixing executive compensation is an exercise in corporate management and therefore is among the tasks the directors are charged with carrying out. *See* CAA § 2–401(a) ("The business and affairs of a corporation shall be managed under the direction of a board of directors.").

■■■ The directors of a corporation stand in a fiduciary relation to the corporation and to its stockholders. *Storetrax.com, Inc. v. Gurland,* 397 Md. 37, 53, 915 A.2d 991 (2007); *Booth v. Robinson,* 55 Md. 419, 422 (1881). In Maryland, the standard of care a director owes to the corporation, in manag-

ing the corporation, is set forth in CAA section 2–405.1(a), which states:

A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

In performing his or her duties, a director "is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by" reasonably reliable officers and employees, competent and knowledgeable professionals, such as lawyers and accountants, and board-designated committees that the director reasonably believes merit confidence. CAA § 2–405.1(b)(1). If the director "has any knowledge concerning the matter in question which would cause such reliance to be unwarranted," then the director "is not acting in good faith." CAA § 2–405.1(b)(2).

■ Pursuant to CAA section 2–405.1(e), "[a]n act of a director of a corporation is presumed to satisfy the standards of [CAA 2–405.1(a) ]." Subsection (e), which was added to the statute by chapter 300, Acts 1999, codifies, with some changes, the judicially-created "business judgment rule." *See Yost v. Early,* 87 Md.App. 364, 378, 589 A.2d 1291 (1991) (stating that "the business judgment rule [is] a presumption that corporate directors acted in accordance with" the standard of care imposed upon them). Under the codified business judgment rule, " '[t]he burden is on the party challenging the decision [of the directors] to establish facts rebutting the presumption' that the directors acted reasonably and in the best interests of the corporation." *Bender v. Schwartz,* 172 Md.App. 648, 667, 917 A.2d 142 (2007) (quoting *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)). *See also Werbowsky, supra,* 362 Md. at 618–19, 766 A.2d 123.

■ The business judgment rule in its present form in Maryland therefore dictates that a party challenging in court a director's decision not only introduce evidence that the director did not act with ordinary care under the circumstances but also that the director did not act in good faith and did not act in a manner he or she reasonably believed was in the best interests of the company. "Thus, the business judgment rule in Maryland requires proof sufficient to overcome a presumption of good faith and adequate information before the court will receive evidence on the best interests element of subsection (a)(2) and the elements of subsection (a)(3)." James J. Hanks, Jr., *Maryland Corporation Law* 183 (Aspen 2005) (footnotes omitted).

■ Maryland common law recognizes that minority shareholders are entitled to protection against fraudulent or illegal action of the majority. Especially in closely held corporations, the majority shareholder owes a fiduciary duty to the minority shareholder (or shareholders) "not to exercise [their] control to the disadvantage of minority stockholders." *Lerner v. Lerner Corp.*, 132 Md.App. 32, 53, 750 A.2d 709 (2000). A majority shareholder owes a fiduciary duty to minority shareholders not to use his voting power for his own benefit or for a purpose adverse to the interests of the corporation and its stockholders. *Cooperative Milk Serv. v. Hepner*, 198 Md. 104, 114, 81 A.2d 219 (1951).

■ A shareholder may bring a direct action against the corporation, its officers, directors, and other shareholders to enforce a right that is personal to him. To maintain a direct action, the shareholder must allege that he has suffered "an injury that is separate and distinct from any injury suffered either directly by the corporation or derivatively by the stockholder because of the injury to the corporation." Hanks, *supra*, at 271 (footnote omitted). Any damages recovered by the shareholder in the direct action go to the shareholder himself.

■ In managing the affairs of the corporation, the directors make business decisions, including deciding whether

the company should pursue litigation to redress an injury to it. *Bender, supra,* 172 Md.App. at 665, 917 A.2d 142. Ordinarily, a shareholder does not have standing to sue to redress an injury to the corporation. William Meade Fletcher, 12B *Fletcher Cyclopedia of the Law of Private Corporation* § 5729 (Perm. Ed., 2000 Rev. Vol.). What is known as a shareholder's derivative action is an exception to that rule. A derivative action is "an extraordinary equitable device to enable shareholders to enforce a corporate right that the corporation failed to assert on its own behalf." *Werbowsky, supra,* 362 Md. at 599, 766 A.2d 123. The derivative form of action was developed as a check on the broad management powers of the board of directors, by permitting "an individual shareholder or a group of shareholders to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties' where those in control of the company refuse to assert a claim belonging to it." *Bender, supra,* 172 Md.App. at 665, 917 A.2d 142 (quoting *Kamen v. Kemper Financial Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991), in turn quoting *Ross v. Bernhard,* 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)). Any recovery in a shareholder's derivative suit is in favor of the corporation, not the individual shareholder (or shareholders) who brought the derivative action.

In *Waller v. Waller,* 187 Md. 185, 189–91, 49 A.2d 449 (1946), the Court explained the Maryland common law of shareholder derivative actions:

It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative

right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

Generally, therefore, a stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock or rendered it valueless. Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity. . . . The rule is applicable even when the wrongful acts were done maliciously with intent to injure a particular stockholder. It is immaterial whether the directors were animated merely by greed or by hostility toward a particular stockholder, for the wrongdoing affects all the stockholders alike. It is accordingly held that a stockholder cannot sue individually to recover damages for injuries to the corporation, notwithstanding that the directors may have entered into an unlawful conspiracy for the specific purpose of ruining the corporation. . . . [Even when the actions of the directors force the corporation into a receivership in order to eliminate a large stockholder as an officer and to acquire control], the wrongs are suffered by the injured person in his capacity as a stockholder, and the action to recover for resulting injuries should be brought by the receiver.

(Citations omitted.) *See also Danielewicz v. Arnold,* 137 Md.App. 601, 616–22, 769 A.2d 274 (2001).

"Before bringing a derivative suit in Maryland . . . , the shareholder must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile." *Bender, supra,* 172 Md.App. at

666, 917 A.2d 142. "Once a demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation." *Id.* If after investigation, the corporation, through its directors, fails to bring the requested litigation, the shareholder(s) may bring a "demand refused" derivative action. *Id.* "By making a demand, the shareholder(s) 'are deemed to have waived any claim they might otherwise have had that the board *cannot independently act* on the demand[,]' " although they still may claim that the board in fact did not act independently or that the demand was wrongfully refused. *Id.* (quoting *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74 (Del.1997)) (emphasis in *Bender*). If no demand is made on the board, and the shareholder(s) proceeds with bringing a derivative action, the shareholder(s) must prove that any demand upon the board would have been futile. *Id.*

**(c)**

The evidence at trial showed that Cap's compensation, including salary and bonuses, and any reimbursements for business expenses he incurred, were determined by the Board of Directors. From 2001 through 2004, and part of 2005, Cap's salary and bonuses were as follows (with the bonuses actually being awarded based upon the prior year's experience):

2000: Salary: $174,595.94, Bonus $217,000
2001: Salary: $149,570.22, Bonus $200,000
2002: Salary: $235,998.61, Bonus $367,502.04
2003: Salary: $344,086.30, Bonus $367,502.04
2004: Salary: $364,998.40, Bonus $132,497.96
2005: (estimated) Salary: $383,000, Bonus $600,000

For Mark to generate a jury issue as to whether Cap, as the majority shareholder, breached a fiduciary duty to him, as the minority shareholder, by orchestrating an excessive compensation package and reimbursements for himself that somehow deprived Mark of dividends he deserved to receive,

Mark first had to show that the directors breached the standard of care in setting Cap's compensation and approving his reimbursements. And before that issue could properly be submitted to the trier of fact for decision, it was incumbent upon Mark to adduce some evidence to rebut the presumption that, in setting Cap's compensation and approving his reimbursements, the directors acted in good faith and in a manner they reasonably believed was in the best interest of the corporation. Without such evidence, the business judgment rule presumption would remain in place and, as a matter of law, Mark would not have generated a triable issue on his breach of fiduciary duty claim.

As noted previously, the court granted Cap's motion for judgment on a determination that there was "no evidence [adduced in Mark's case] that the judgments made by the Board of Directors ... were anything other than in good faith," and therefore the presumption that the directors exercised due care in performing their duties in setting Cap's salary and bonuses and approving his reimbursements remained. We have reviewed the record, including all of the testimony of the witnesses called by Mark in his case, and the relevant documentary evidence, and agree that Mark made no showing of lack of good faith.

There was no evidence adduced whatsoever about the amount of any reimbursements made to Cap for expenses that Mark thought were improper. Accordingly, with respect to the reimbursement aspect of Mark's breach of fiduciary duty claim, there was a complete failure of proof.

With respect to Cap's compensation, the record evidence showed that in April 2002, Cap announced that he was returning to the company as CEO. At that time, the members of the Board were John Denison, Cap's brother in law; Bill Scott, the company's lawyer; and Cap. That Board terminated Mark from the company. Mark has never alleged in any of his filings that he was wrongfully terminated. Thus, as of April 2002, Mark no longer was working for MEG and Cap was serving as President and CEO of the company.

In the fall of 2003, in a vote by Cap, as the sole owner of voting stock in MEG, Janet Miller and Paul Warren replaced Denison and Scott as directors. Miller, whose title was Director of Corporate Affairs, had been employed by the company since 1979, and for many years was Cap's right hand assistant. Warren was the head of MEG's Baltimore office.

At trial, Mark called as witnesses Patrick Becker and Robert Wilson. He also called Miller and Cap adversely, testified on his own behalf, and introduced into evidence portions of Cap's answers to interrogatories and deposition.

Becker was hired in 1999 as the company's controller. He remained in that position until February 2004, when he was made senior vice president of finance. Originally, he reported to Wilson, who was the company's chief operating officer and chief financial officer. Wilson left the company in May 2002. At that time, Becker was promoted to vice president and controller; he later was promoted to senior vice president. He reported to Cap as the CEO. Becker was terminated from his position in February 2004.

Becker testified that he knew that, prior to Cap's returning to MEG as CEO in April 2002, there had been an "owner balancing" formula that was used to set salaries for both Mark and Cap, by which personal advances they had taken from the company over the course of a year would be tallied and equalized. Bonuses for a year were determined in the spring of the following year. Before he left the company in February 2004, he ran some numbers for Cap that would have calculated his bonus for 2003 based upon the owner balancing formula as it was used in 1995. His recollection was that the formula produced a low number. He testified, however, that he did not know what formula in fact was used to calculate Cap's bonus for 2003, which was determined after he left the company.

Wilson testified that, during his time at MEG, he did not know whether there was any agreement that Cap and Mark would be paid equally. He was not a director in the company.

Miller testified that in 2003, Cap received a bonus of $367,502.04, which was "based on his job performance that he

had performed for the prior year." Contrary to what certain questions posed by Mark's counsel suggested, Cap was not paid any money above and beyond that sum for taxes. Cap had requested that he be paid a bonus of $440,000 for that year. In an email to the Board, he attached a formula that had been used to set compensation for him and for Mark in the past. If that formula had been applied, Cap's bonus would have been between $592,000 and $792,000. Another salary range that was suggested to the Board for Cap by the company's outside accountant was between $287,000 and $444,000. Miller explained that the company pays bonuses to employees "for going over and beyond your normal compensation, what's expected of you; for those who reach out and go over." The company does not pay bonuses to people who are no longer employees, regardless of whether they are shareholders. In 2003, Mark no longer was an employee of the company.

In his brief, Mark complains that there was evidence of the following, which was sufficient to make the breach of fiduciary duty claim a jury issue: that Cap used his status as the sole holder of voting stock in the company to appoint friends, employees, and family members to the Board of Directors, so as to "manipulate and control" the internal decisions of the Board; that Cap used the Board to fabricate false claims against Mark, which then were used to deduct sums form Mark's share of the March 2005 dividend; that Cap directed that financial statements that were being sent to Mark give inaccurate information; that Cap received significant increases in his executive compensation, while Mark's total compensation was drastically reduced; and that Cap acted with an intent to punish Mark.

This evidence was not legally sufficient to show that the Board of Directors did not act in good faith in setting Cap's compensation; and the evidence that would be necessary to adduce to make such a showing is not in the record.

First, the evidence showed that Cap was the sole owner of voting stock in the company, and had been since its inception

in 1966. The evidence also showed that, before the period of time relevant to this case, the company's directors were not "outside directors," but were friends, relatives, employees, and professionals with whom Cap had a personal relationship. In other words, there was no evidence that the directors Cap voted onto the Board in the fall of 2003 were less independent than the directors who preceded them. Moreover, there was nothing in the evidence to show that any of the directors' votes were controlled by Cap.

To the contrary, the only evidence about the setting of compensation for Cap by the Board showed that Cap, who did not vote on his own compensation, made his desires known to the directors, but that they made their decision based upon information from a number of sources, and their decision was not always in line with what Cap requested. Indeed, the evidence showed that the directors gave Cap less income than what he had requested.

Second, the evidence showed that the significant increases in Cap's compensation and the significant decreases in Mark's compensation, to zero, occurred when Mark was terminated from employment and Cap took over management of the company. Obviously, after April 2002, Mark was not going to receive a salary and bonuses, which are paid to employees, because he was no longer an employee. Equally obvious, beginning in April 2002, Cap was going to receive additional compensation for his work as president and CEO of the company, because he now held those positions. Given the circumstances, it would be surprising if there had *not* been a dramatic increase in Cap's compensation at the same time that there was a dramatic decrease in Mark's compensation.

Third, there was no evidence of any sort, including expert testimony, that the amount of compensation paid to Cap from 2002 forward was not commensurate with compensation paid to executives at similar corporations during times of similar performance. On the contrary, the only evidence on that point was that Cap's compensation was within an acceptable range compared to other executive compensation packages.

Finally, Mark is correct that there was evidence at trial that Cap was hostile toward him. Indeed, there was evidence of mutual hostility. There was no evidence, however, that the Board's decisions about the amount of compensation Cap was to receive somehow were made with a purpose to punish Mark, as opposed to with a purpose to fairly compensate Cap.

### (d)

As stated above, we also conclude that Mark's breach of fiduciary claim against Cap failed as a matter of law on damages, because his damage claim was for an alleged injury to the company, not to himself. Mark attempted to show at trial that the salary and bonuses Cap received were excessive. For the reasons we have explained, he did not produce evidence sufficient to overcome the presumption, under the business judgment rule, that the Board of Directors acted properly in setting Cap's compensation. Even if he had produced such evidence, however, the evidence did not show that Mark himself sustained any injury for which he could recover damages in an action for breach of fiduciary duty against Cap.

Mark argues that Maryland case law supports the proposition that a majority shareholder in a closely held corporation, that is, one in which there are few stockholders, owes a fiduciary duty to the minority shareholders, and that a minority shareholder thus has standing to bring a direct action against the majority shareholder for breach of fiduciary duty.[8] What Mark does not adequately address, however, is how the injury for which he sought damages—the alleged overpayment of compensation to Cap by the company—was personal to him. It does not follow that, merely because MEG has two shareholders, Cap and Mark, an overpayment of compensation to Cap is a loss to Mark. Cap's compensation was paid to him by MEG for his role as an officer of the company. Any wrongful overpayment by the company of compensation to an officer is at most a loss to the company.

---

8. MEG is not a "close corporation" under CAA section 4–201, governing election to be a close corporation.

The damages Mark was seeking to recover, therefore, were for an injury that, if it was sustained at all, was sustained by MEG, not by Mark. For that reason, Mark could not pursue recovery of damages for that injury in a direct action against Cap. His only vehicle for doing so was a derivative action against MEG.

As we have discussed, Mark included in his complaints a derivative claim, which eventually was narrowed to a derivative claim against Cap only. As required, Mark had made a written demand upon the company, by letter of November 20, 2002, prior to filing suit in the form of a derivative action. However, his demand letter said nothing whatsoever about excessive compensation or reimbursements paid by the company to Cap. In other words, he did not demand, prior to filing suit, that the Board of Directors initiate litigation on behalf of the company against Cap to recover excessive compensation paid to him. For Mark to pursue that form of derivative relief on the part of the company, it was essential that he give the company notice. *See, e.g., Bender, supra,* 172 Md.App. at 666, 917 A.2d 142 (discussing necessity of demand). He did not do so, and therefore could not attempt to recover derivatively damages to the company for excessive payments to Cap. Indeed, the court disposed of Mark's derivative claim on motion for judgment because his demand letter did not seek any remedial action by the Board, and thus was legally insufficient to give the Board required notice.

For both of the reasons argued by Cap in support of his motion for judgment on the breach of fiduciary duty claim, the evidence at trial was not legally sufficient to submit the claim to the trier of fact for decision. Accordingly, the trial court's decision to grant judgment in favor of Cap on Mark's breach of fiduciary duty claim was legally correct.

## II.

### DID THE TRIAL COURT ERR BY REDUCING THE JURY VERDICT UPON A FINDING THAT MARK DID NOT COME TO COURT WITH "CLEAN HANDS" WITH RESPECT TO ONE ITEM OF DAMAGES?

The facts pertinent to this issue are as follows.

At trial, both Mark and Cap introduced into evidence a "tax basis letter" dated December 31, 1998, and signed by Mark.[9] It states, "I hereby agree to assume the liability to repay advances made to Mona Energy, LLC of $428,753 and $25,000 . . . if such amounts should become uncollectible."

Wilson testified that, by means of the tax basis letter, Mark and Cap were guaranteeing the debts of Mona Energy to MEG, and that doing so gave each of them a tax advantage. Specifically, guaranteeing the advances made by MEG to Mona Energy enabled them to write off losses on their personal tax returns, up to the amount guaranteed. Wilson further testified that, during his tenure with MEG, he did not know of any occasion when the company had forgiven an advance made to a shareholder, officer, or employee.

Becker testified that he knew by November 20, 2002, that the advances made by MEG to Mona Energy had been personally guaranteed by Mark and Cap. On August 4, 2003, he wrote a letter to Mark, on behalf of MEG, making demand for payment of the debts of MEG he had guaranteed, including his one-half share of the Mona Energy debt. Cap instructed him to write that letter. Mark did not pay the sum demanded.

Cap testified that he and Mark had guaranteed the Mona Energy advances, and that he had repaid his half ($581,789) of the advances.

On direct examination, Mark denied ever having agreed to personally guarantee the advances MEG made to Mona Energy. He acknowledged, however, that on October 5, 1999, his accountant faxed the tax basis letter to him, with a cover sheet stating: "Mark this is a 'basis letter' protecting your deduction." Mark explained that the accountant's note on the cover sheet meant that the tax basis letter "was something [the accountant] needed on an accounting side, to have it, so that we would still be a tax deduct because we are an S Corp."

---

9. Cap testified that he signed an identical letter, although only the letter signed by Mark was introduced into evidence.

On cross-examination, Mark agreed that Mona Energy had not repaid its debt to MEG at any time before he signed the tax basis letter; and therefore the tax basis letter could be read to mean that he was "personally guaranteeing to assume that liability." That prompted the trial judge to question Mark, as follows:

THE COURT: ... Your understanding [was] that this was a basis letter?

MARK: Correct.

THE COURT: And you understood that this was a basis letter in order to take the losses off of your personal income taxes?

MARK: In the case it would be the company's income burden, that flows through to me personally.

THE COURT: Did you take those losses? ... Did you take those taxes off of your income taxes?

MARK: Yes.

Mark went on to testify that it had been necessary for him to execute the tax basis letter to "protect the losses" he had taken on his personal tax return in 1998, and that, without the letter, he would not have been allowed to offset those losses against his income. Offsetting the losses against his income had the effect of reducing his taxable income.

As mentioned previously, the jury's damages award to Mark included the $581,789 that MEG deducted from his share of the March 2005 dividend in repayment of the advances MEG had made to Mona Energy. If Mark had personally guaranteed the Mona Energy debt, the sum was properly deducted. If he did not personally guarantee the Mona Energy debt, the sum was not properly deducted. By its verdict, then, the jury found, implicitly, that Mark had not personally guaranteed the Mona Energy debt.

During the hearing on MEG's motion for JNOV, the trial judge raised the issue of whether, with respect to the Mona Energy debt to MEG, Mark had come to a court of equity with "unclean hands"; that is, whether Mark was seeking to

recover a sum that MEG had deducted from his dividend share in order to repay the Mona Energy debt, on the ground that he had not personally guaranteed the debt, when his own testimony established that he had been able to take a personal tax deduction that was available to him only because he had expressly represented that he was personally guaranteeing advances made to Mona Energy. The court directed the parties to brief the "clean hands" issue and, in particular, to discuss the case of *Smith v. Cessna Aircraft,* 124 F.R.D. 103 (D.Md.1989).

After the parties submitted their memoranda, a second hearing was held. At the outset, the court framed the issue before it as follows:

The issue for me is did you [Mark] or did you not have a basis to take that [federal tax] deduction.

If you did have a basis to take the deduction it was based on the guarantee letter. If it's based on the guarantee letter and you took that deduction, how can you now make a claim for unjust enrichment on that portion of the debt that was guaranteed to Mona Energy LLC. That's the issue for me.

The court heard argument of counsel and then ruled from the bench. It concluded that, having taken a federal income tax deduction based upon the representation, in 1999, that he was personally guaranteeing the Mona Energy loan, Mark should not be seen to recover that sum upon present testimony that he had *not* personally guaranteed the loan. The court explained:

Plaintiff sued in a multi-count complaint, the only count of which [that] survived to the jury was the unjust enrichment count. Unjust enrichment is a count in equity. Equity requires that for the plaintiff to recover in equity, the plaintiff must come in with clean hands.

I further grant this motion based on Judge Smalkin's opinion in the [*Smith v. Cessna Aircraft*] case wherein Judge Smalkin finds that the judge has some responsibility to ensure the integrity of the judicial process.

I find that the—with respect to this guarantee [of the Mona Energy advances], the plaintiff came in with unclean hands, and as a result a fraud was perpetrated upon the Court, when he took deductions on his personal income taxes based on a basis letter dated December 31, 1998, and yet comes in and now sues for the company—the defendant company's deduction from his dividend of those guaranteed losses.

On appeal, Mark contends the trial court erred by reducing his damages award by $581,789, postjudgment, based upon the doctrine of unclean hands. His argument is two-fold: 1) the trial court did not have the authority to reduce the verdict on a motion for JNOV and its action was in contravention to Rule 2–535(b); and 2) if the trial court did have such authority, it erred as a matter of law and fact in exercising it.

### (a)

Mark points out that, in moving for judgment at the close of the evidence, MEG did not advance a "clean hands" argument. He argues, therefore, that the trial court could not grant a JNOV motion on that ground. He points to Rule 2–532(a), which states: "In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion." Mark also argues that a JNOV motion cannot be used as a vehicle for a trial court to amend, reduce, or alter a jury verdict. He maintains that, for either reason, the trial court lacked the authority to reduce his damages award pursuant to a motion for JNOV.

Mark argues, further, that, because when the court made its ruling reducing the damages award, more than 30 days had passed since the entry of judgment, it no longer had broad revisory power over the judgment, pursuant to Rule 2–535(a); rather, the court only had limited revisory power upon proof of fraud, mistake, or irregularity, under Rule 2–535(b). As there was no such proof, the court erred in revising the judgment by reducing the damages award.

The purpose of a JNOV motion is to test the legal sufficiency of the evidence. *Mahler v. Johns Hopkins Hosp., Inc.,* 170 Md.App. 293, 317, 907 A.2d 276 (2006). For that reason, the court may not use a motion for JNOV as a vehicle to reduce or add to the amount of damages the jury has awarded. *See Exxon Corp. v. Schoene,* 67 Md.App. 412, 415 n. 1, 508 A.2d 142 (1986); *Millison v. Clarke,* 32 Md.App. 140, 143, 359 A.2d 127 (1976); *Cheek v. J.B.G. Props., Inc.,* 28 Md.App. 29, 43, 344 A.2d 180 (1975).

Under Md.Code (1973, 2006 Repl.Vol.), section 6–408 of the Courts and Judicial Proceedings Article ("CJ") and Rule 2–535(a), a circuit court has broad power to revise its judgment before it is enrolled, that is, within 30 days after entry. Indeed, during that period of broad revisory power, the court may *sua sponte* revise its judgment. *Maryland Bd. of Nursing v. Nechay,* 347 Md. 396, 409, 701 A.2d 405 (1997); *Yarema v. Exxon Corp.,* 305 Md. 219, 241 n. 21, 503 A.2d 239 (1986). *See* CJ § 6–408 (stating that, "[f] or a period of 30 days after the entry of a judgment, or thereafter pursuant to motion filed within that period, the court has revisory power and control over the judgment").

Accordingly, in the case at bar, if the trial court had the power to act pursuant to Rule 2–535(a), it had the power to *sua sponte* revise its judgment to strike an award of damages that, in the court's estimation, Mark obtained with "unclean hands." (Clearly, there was no proof of fraud, mistake, or irregularity so as to justify revision of the judgment pursuant to Rule 2–535(b).) And, if that were the situation, it matters not whether MEG preserved the issue for purposes of a JNOV motion.

The broad revisory power afforded the court by CJ section 6–408 and Rule 2–535(a) is for a period of 30 days after entry of judgment. Ordinarily, then, once judgment is entered, and if there is no postjudgment motion filed in the ensuing ten days, the court may exercise its broad revisory power during the 30 days following entry of judgment, and not beyond.

In this case, however, MEG filed a timely ten-day postjudgment motion (the motion for JNOV), which had the effect of suspending the 30-day period in which the judgment would have become enrolled, and in which an appeal, if any, would have to be noted. *Tierco Maryland, Inc. v. Williams,* 381 Md. 378, 393, 849 A.2d 504 (2004); *see also Shabazz v. Bob Evans Farms, Inc.,* 163 Md.App. 602, 619 n. 2, 881 A.2d 1212 (2005). As a consequence, the judgment did not become enrolled 30 days after its entry. Rather, it only became enrolled 30 days after the court ruled on the JNOV motion. During the interim, the trial court retained its broad revisory power over the judgment, under CJ section 6–408 and Rule 2–535(a). It was not operating under the limited authority to revise set forth in Rule 2–535(b).

To be sure, in revising the judgment by eliminating the damages linked to the Mona Energy loan, the trial judge said that he was granting the motion for JNOV, in part. If the court had had no authority to so revise the judgment, or if its authority had been constrained by Rule 2–535(b), we would conclude that the court had erred. That was not the case, however. The court had authority to revise the judgment as it did, but merely under a different source—CJ section 6–408 and Rule 2–535(a). Accordingly, the court acted within its broad revisory authority when it revised its judgment by reducing Mark's damages award by the amount of the Mona Energy loan.

### (b)

On the merits, Mark argues that the trial court erred in ruling that he should not recover, as damages for unjust enrichment, the sum MEG deducted from his dividend portion, in repayment of his share of the Mona Energy Loan, because, with respect to that loan, he did not come to court with clean hands.

Under Maryland law, the elements of a claim of unjust enrichment are: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the

benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651–52, 887 A.2d 525 (2005) (citing *County Com'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 95 n. 7, 747 A.2d 600 (2000)). "A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment." *Berry & Gould v. Berry*, 360 Md. 142, 151, 757 A.2d 108 (2000) (quoting Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983)).

As we have explained, Mark's theory of recovery on his unjust enrichment claim was that MEG declared a dividend, in March 2005, which entitled him to be paid $1,580,000, but then wrongly deducted and retained, for its own benefit, a total of $1,531,590 of that dividend. The Mona Energy advance, totaling $581,759, was one item Mark was claiming MEG had wrongly deducted and retained from his share of the dividend. Mark contended that he had not guaranteed, and therefore had no personal liability for, the monies MEG had advanced to Mona Energy; and hence the corporation had no legal ground for deducting and retaining the $581,759 from his dividend share.

The maxim "he who comes into equity must come with clean hands" is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Traditionally, the clean hands doctrine only applied in equity. It has been expanded, however, to cases at law, as well. *See Manown v. Adams*, 89 Md.App. 503, 513, 598 A.2d 821 (1991), *reversed on other grounds*, 328 Md. 463, 615 A.2d 611 (1992).

In *Turner v. Turner*, 147 Md.App. 350, 419, 809 A.2d 18 (2002), this Court summarized the clean hands doctrine as follows:

> The equitable doctrine of unclean hands is "designed to 'prevent the court from assisting in fraud or other inequitable conduct....'" *Gordon v. Posner*, 142 Md.App. 399, 433, 790 A.2d 675 (quoting *Adams v. Manown*, 328 Md. 463, 482, 615 A.2d 611 (1992)), *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002). It is available to deny relief to those guilty of unlawful or inequitable conduct with respect to the matter for which relief is sought. *Hicks v. Gilbert*, 135 Md.App. 394, 400, 762 A.2d 986 (2000). It is "not applied for the protection of the parties nor as a punishment to the wrong-doer." *Adams v. Manown*, 328 Md. at 474–75, 615 A.2d 611. Instead, "it protects the integrity of the court and the judicial process by denying relief to those persons 'whose very presence before a court is the result of some fraud or inequity.'" *Hicks*, 135 Md.App. at 400, 762 A.2d 986 (citation omitted).

Thus, the clean hands doctrine "is intended to protect the courts from having to endorse or reward inequitable conduct." *Adams, supra*, 328 Md. at 475, 615 A.2d 611. Its purpose is to "safeguard the judicial process." *Smith, supra*, 124 F.R.D. at 106.

For the clean hands doctrine to apply, "there must be a nexus between the misconduct and the transaction [at issue], because "'what is material is not that the plaintiff's hands are dirty, but that (she) dirties them in acquiring the right (she) now asserts.'" *Turner, supra*, 147 Md.App. at 420, 809 A.2d 18 (quoting *Hicks, supra*, 135 Md.App. at 400–01, 762 A.2d 986). In other words, "[t]he plaintiff's misconduct must be directly related to the subject of the suit." *Smith, supra*, 124 F.R.D. at 106. *See also Adams, supra*, 328 Md. at 475, 615 A.2d 611 ("[A]n important element of the clean hands doctrine is that the alleged misconduct must be connected with the transaction upon which the claimant seeks relief."); and Dan B. Dobbs, *Law of Remedies*, § 2.4(2) at 95 (2d 1993) ("Courts are agreed that the plaintiff's improper conduct,

whatever it is, must be related in some substantial and significant way to the claim he now asserts.").

In *Adams,* a photographer, Adams, sued his former business partner and paramour, Manown, to recover $43,000 in loans he had extended to her that she had not repaid. Manown raised the clean hands doctrine on the ground that, during Adams's divorce from his wife, he had fraudulently concealed the existence of a boat that was marital property by giving title to Manown, but without receiving payment for it. Manown argued that Adams's fraud in concealing marital property from his ex-wife, and thereby depriving the ex-wife of the benefit of its value, should operate to preclude him, under the clean hands doctrine, from recovering money Manown owed him on the loans. The circuit court declined to apply the clean hands doctrine. The Court of Appeals upheld that decision, holding that Adams's fraud in concealing the item of marital property was independent of his claim against Manown for money owed on the loans.

By contrast, in *Turner,* this Court upheld a trial court's exercise of discretion to disallow, under the clean hands doctrine, certain claims by a wife against a husband in a divorce action. For decades, the parties had worked in a business started by the husband and developed by both of them. From 1976 to 1994, the parties together siphoned money off the company for their own personal use. They agreed to stop doing so in 1994, when a disgruntled former employee threatened to expose their misconduct to the Internal Revenue Service (IRS). From 1995 to 1997, the wife abided by that agreement; without her knowledge, however, the husband continued to take money from the company for his personal use. By that time, the parties' relationship had deteriorated. They separated in mid–1997. When the wife learned that the husband had resumed diverting money from the company, she negotiated with him to overlook what he had done if an equal amount of money were diverted to her. Also, shortly after the parties separated, the wife herself made an unauthorized withdrawal of $30,000 in corporate funds.

In one count of her divorce complaint, the wife sought money damages against the husband for improper diversion of corporate funds. The husband counterclaimed for the $30,000 the wife had taken from the company. The trial court denied relief on both counts. The judge stated, with respect to the wife's claim, "[T]he doctrine of unclean hands serves to bar [the wife's] claims for corporate relief based upon diversion of funds. She was complicit in this precise activity over a course of nearly 20 years and will not be heard to complain about it now solely on the basis that profits from fraud were not evenly shared." *Turner, supra,* 147 Md.App. at 417, 809 A.2d 18 (footnote omitted). The trial court denied the husband's counterclaim on the clean hands doctrine as well.

In affirming the trial court's rulings, this Court determined that there was a sufficient nexus between the wife's past misconduct and her present claim for the clean hands doctrine to apply. "[The wife] previously aided her husband in diverting funds from [the company]. Although the idea may have originated with [the husband], and [the wife's] participation in the illegal conduct ended about a year before [the husband] resumed the practice, [the wife] was a willing participant at the outset." *Id.* at 420, 809 A.2d 18.

In *Smith, supra,* a tort plaintiff sued to recover damages for personal injuries he sustained when his single-engine airplane crashed. Among other items, he sought to recover damages for lost income from his contracting business. In his answers to interrogatories, he attested to his annual income in each year from 1982 through 1986, in response to a question asking his income "as reflected by [his] federal income tax returns." *Smith, supra,* 124 F.R.D. at 104. He also responded to a request for production of his tax returns by stating that they would be produced. He produced documents that purported to be tax returns for some of the years in question, but failed to produce any others. As it turned out, he in fact had not filed returns for the years 1983 through 1987. In a deposition in follow up to that revelation, the plaintiff admitted to not filing tax returns, acknowledged that he knew he had violated the law by not doing so, and further admitted that his prior

representations in the litigation had created a false impression that he had filed tax returns.

The federal district court applied the clean hands doctrine to rule that the plaintiff would be precluded from recovering any damages for lost income as a consequence of the accident. It explained that application of the clean hands doctrine is a matter of discretion:

> The court possesses broad discretion in determining whether and how to apply the [clean hands] maxim upon learning that a plaintiff's hands are unclean. Thus, courts "are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–46, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933). Generally, the clean hands doctrine completely bars a plaintiff *in limine*. Nevertheless, courts have recognized that if the fraud relates only to some of the plaintiff's claims, then the entire suit need not be dismissed. Instead, the court need only bar the plaintiff's recovery for the claims tainted by the misconduct.

*Id.* at 107 (some citations omitted). The court concluded that the plaintiff's hands were unclean with respect to his request for damages for compensation for lost income, and that it was "appropriate ... to dismiss [his] claims for damages for lost income, because the false tax and income information provided by [him] was directly relevant to such claims." *Id.* It commented: "[T]he Court is disturbed that [the plaintiff], who for five years failed to pay his taxes, now seeks to vindicate his claim through the federal court system, itself dependent upon the prompt and honest reporting and payment of federal taxes." *Id.*

■ We return to the "clean hands" ruling in the case at bar. The trial judge concluded that Mark had come to court with unclean hands with respect to the Mona Energy advances because, having signed the "tax basis letter," in which he represented to the MEG Board of Directors, and ultimately to the IRS, that he was personally responsible for $428,753 in

advances to Mona Energy from MEG, thereby enabling him to take a loss on his federal income tax return up to that amount, he then challenged in court MEG's right to deduct the Mona Energy advances from his portion of the March 2005 dividend, on the ground that he was *not* personally responsible for any of those advances.

On appeal, Mark maintains that the trial court erred or abused its discretion in applying the clean hands doctrine because 1) his testimony about the tax basis letter, unlike the plaintiff's testimony about his income in *Smith,* was consistent, fully disclosed, and not perjurious; 2) there was not a sufficient nexus between the tax basis letter and the Mona Energy advances that were deducted from his share of the MEG dividend for the clean hands doctrine to apply to bar his recovery of damages related to the Mona Energy advances; 3) expert accounting testimony, which he submitted to the court by way of an affidavit, showed that he did not receive any appreciable benefit on his 1998 tax return from taking the Mona Energy losses described in the tax basis letter; 4) he never understood the tax basis letter to be a guarantee of the debts of Mona Energy, and, at most, the letter is ambiguous in that regard; 5) he signed the tax basis letter at the direction of MEG's certified public accountant, and was entitled to rely upon the advice of a professional who had more knowledge than he about the meaning of and necessity for the tax basis letter; and 6) the court's ruling usurped the jury's function of assessing his credibility. These arguments are unavailing.

At trial, Mark testified that he received the tax basis letter from the company's accountant, read it, and signed it. He acknowledged that, by signing the letter, he was representing that he had agreed to be responsible for "advances" made by MEG to Mona Energy, *i.e.,* for repayment of monies that MEG had advanced to Mona Energy, and for which Mona Energy was responsible. He further testified that it was necessary for him to sign the tax basis letter in order to be able to take as losses, on his personal income tax return, an amount up to the amount he had agreed to pay. In other words, if he signed the tax basis letter, he could take up to

$428,753 in Mona Energy losses on his personal tax return. Mark further acknowledged that he indeed took those losses.

 The ambiguity *vel non* of a writing is a question of law, to be decided *de novo* by the appellate court. *Calomiris v. Woods*, 353 Md. 425, 434, 727 A.2d 358 (1999) ("[T]he determination of ambiguity is one of law, not fact, and that determination is subject to *de novo* review by the appellate court."); *see also Gordy v. Ocean Park, Inc.*, 218 Md. 52, 60, 145 A.2d 273 (1958). A writing is ambiguous if its plain language objectively could be understood to have more than one reasonable meaning. *Prison Health Servs., Inc. v. Baltimore County*, 172 Md.App. 1, 9, 912 A.2d 56 (2006).

The tax basis letter in the case at bar is not ambiguous. It states: "I hereby agree to assume the liability to repay advances made to Mona Energy, LLC of $428,753 and $25,000 at December 31, 1998 from Mona Electrical Service, Inc., and Mona Electrical Construction, Inc., respectively, if such amounts should become uncollectible." There is nothing unclear about those words. They are plainly a guarantee by Mark to MEG of the $428,753 in advances made to Mona Energy by MEG as of year end 1998. They cannot reasonably be read to mean anything else.

 Perjury or false testimony need not be proven for the clean hands doctrine to apply. What must be shown is that a party who engaged in misconduct, unlawful or inequitable, about a matter is trying to use the court system to obtain relief or profit with respect to that same matter.

Mark's conduct with respect to the Mona Energy advances was sufficiently inconsistent to implicate the doctrine. His theory of recovery for unjust enrichment *vis-à-vis* the Mona Energy advances was that he did not have any personal obligation for them, and therefore the company acted improperly by deducting them from his dividend share. He already had represented to the same company and to the IRS, however, that he was responsible for paying the Mona Energy advances, and had taken a tax write-off for the advances. If, as the jury implicitly found, Mark did not guarantee the Mona

Energy advances, he nevertheless acted inequitably (if not unlawfully) in making the precise contrary representation to the MEG board, and ultimately to the IRS, for his own personal tax benefit. And if, as the jury did not find, Mark did guarantee the Mona Energy advances, as he stated in the tax basis letter, then he would have been acting inequitably in seeking their return. In either event, the court would be assisting or condoning inequitable and perhaps unlawful conduct by Mark in permitting him to seek and obtain the return of the Mona Energy deductions.

For these same reasons, Mark's arguments about nexus and usurpation of the jury's credibility-finding function by the court lack merit. As to the latter, whatever credibility finding the jury would have made would have resulted in the court's enabling or condoning his wrongdoing. As to the former, this case is not like *Adams,* in which the property allegedly hidden by Adams during his divorce case was unrelated to the loan he extended to his former partner for which he was seeking payment. Here, the prior conduct and the present relief both concern the Mona Energy advances, and more specifically, Mark's status as guarantor *vel non* of advances made by MEG to Mona Energy.

Moreover, *Turner* teaches that the unclean hands element of nexus can be satisfied by conduct related to the same subject matter, even when the precise sums involved may not correlate exactly. There, the wife wanted the value of the corporation assessed to include sums skimmed from the company by her husband, even though she herself had participated in the same activity, although not in taking the precise same amounts. This Court upheld the trial court's unclean hands ruling, agreeing that the wife should not be permitted to benefit, in the divorce case, from illegal conduct by her husband that she too engaged in; there was no parsing by the court, nor should there have been, of the precise amounts that the husband took, some without the wife's knowledge, and the amounts that he took with her knowledge. It was sufficient

that the wrongful conduct the wife had engaged in was with respect to the same matter for which she was seeking relief.

Likewise, in the case at bar, there is a sufficient nexus between Mark's guarantee representation to the Board respecting the Mona Energy advances as they existed at the end of 1998, and his effort to recoup the amounts deducted by the company from his March 2005 dividend share based upon that representation. To be sure, the sum Mark represented he was guaranteeing in the tax basis letter in December 1998 is a lesser sum than the amount MEG deducted from his share of the dividend declared and paid in March 2005. The evidence showed, however, that *none* of the Mona Energy advances ever were repaid by Mark; that, notwithstanding his representation to MEG in the tax basis letter, he took the position at trial that he never guaranteed *any* of the Mona Energy advances, *i.e.*, that all of the advances up through March 2005 had to be treated alike, regardless of when they were incurred; that, likewise, Mark did not draw any such distinction with respect to Cap's repayment of half of the entire Mona Energy advances, which was made based upon the same guarantee language in the tax basis letter that Mark was arguing was not a guarantee; and that there was no change in Mark's relationship to Mona Energy from 1998 to 2005, in that it was wholly owned by him throughout that period.

In these circumstances, and under the authority of *Turner v. Turner*, the trial court did not abuse its discretion when it ruled that Mark's misconduct was directly related to *all* of the advances made by MEG to Mona Energy, and therefore that the court's permitting Mark to recover *any or all* of the Mona Energy advances deducted from his share of the March 2005 dividend would serve to condone his wrongful conduct.

The circuit court was not bound to accept Mark's testimony that he merely was relying upon the advice of the company's accountant in signing the tax basis letter, or the affidavit of Mark's expert to the effect that Mark's tax benefit from taking the Mona Energy tax write off on his 1998 returns was insignificant. The court was free to reject that evidence, and

doing so was not in the least inconsistent with the jury's findings. Regardless of what the accountant (who also was Mark's accountant) said, for the same reason the language of the tax basis letter is unambiguous, it would not require expert advice to interpret.

Finally, for the reasons we have explained with respect to the issue of nexus, there need not have been a correspondence between the value of the tax benefit Mark in actuality received by virtue of his guarantee representation and the value of the Mona Energy advances the Board deducted from his dividend share.

For all of these reasons, we shall not disturb the trial court's decision to eliminate the $581,789 Mona Energy advances from the damages Mark was awarded.

## Cross-appeal

### I.

*MUST MARK'S APPEAL OF THE REDUCTION OF HIS DAMAGES AWARD BE DISMISSED UNDER THE ACQUIESCENCE DOCTRINE?*

MEG contends that the aspect of Mark's appeal challenging the trial court's ruling reducing the damages awarded for unjust enrichment by $581,789, under the clean hands doctrine, must be dismissed, because Mark acquiesced in the ruling. Specifically, MEG argues that by insisting upon payment of the full amount of the revised judgment, as entered on December 7, 2005, and accepting that payment, Mark acquiesced in the court's ruling and therefore cannot be heard to attack it on appeal.

Although we already have rejected Mark's challenge to the court's ruling reducing his damages for unjust enrichment by $581,789, we nevertheless shall explain that, in any event, that aspect of Mark's appeal is properly before this Court.

The "acquiescence doctrine" is well-settled in Maryland. Simply put, a party cannot both accept the benefit of a judgment on one hand and challenge it on appeal on the

other. *Downtown Brewing Co. v. Mayor of Ocean City,* 370 Md. 145, 803 A.2d 545 (2002). An appeal must be dismissed "if the appellant 1) accepts a benefit from *or* 2) acquiesces in *or* 3) recognizes the validity of the judgment or decree *or* 4) acts in a manner inconsistent with the maintenance of the appeal." *First Maryland Leasecorp v. Cherry Hill Sand & Gravel Co.,* 51 Md.App. 528, 534–535, 444 A.2d 1053 (1982) (citing *Rocks v. Brosius,* 241 Md. 612, 629, 217 A.2d 531 (1966)).

In this appeal, Mark does not challenge the $659,211 he received from MEG in satisfaction of the judgment; if he was appealing that part of the judgment, accepting MEG's payment would, indeed, be inconsistent with maintaining his appeal. In this appeal, Mark challenges only the trial court's authority to reduce the jury's award by the amount of the Mona Energy advances. Because Mark's appeal relates only to the $581,789 reduction of his damages award and not the $659,211 he accepted from MEG, the acquiescence doctrine does not apply.

## II.

### DID THE TRIAL COURT ERR IN RULING THAT MARK WAS ENTITLED TO A JURY TRIAL ON HIS UNJUST ENRICHMENT CLAIM?

At the close of all the evidence, MEG moved to have the unjust enrichment claim decided by the court, not the jury. It argued that unjust enrichment is an equitable claim that is not subject to trial by jury. The court denied the motion, ruling that whether a claim is legal or equitable is not a function of label or form, but is to be decided with reference to the nature of the remedy sought. Because the remedy Mark was seeking was money, the claim properly was treated as one at law, even though it traditionally is a claim in equity; and therefore Mark was entitled to have it decided by a jury.

On appeal, MEG contends that the trial court's ruling was in error. We disagree.

In *Ver Brycke v. Ver Brycke,* 379 Md. 669, 843 A.2d 758 (2004), parents sued their son and daughter-in-law for restitution, seeking to recover $200,000 they allegedly gave the children as a conditional gift. The Court of Appeals explained that, although restitution is an equitable claim, when it is brought to recover money, it serves many of the same compensatory purposes of a damages award in a legal claim. For that reason, restitution claims for money are treated as claims at law, for which there is a right to trial by jury. The Court held that because the remedy the parents were seeking essentially was compensatory, they were entitled to a jury trial. *See also* Dobbs, *supra,* § 2.1(3) at 65–66 (explaining that, ordinarily, if the plaintiff claims an equitable remedy, neither party has a right to a jury trial, but, if the plaintiff seeks what are essentially damages, the case must be submitted to a jury on demand).

In the case at bar, Mark initially was suing to compel MEG to declare a dividend. If his action had proceeded on that claim, the decision whether the company had breached an obligation to pay a dividend would have been equitable in nature, and would not have been subject to trial by jury. *See id.* As we have recounted, however, in March 2005, well after the litigation was underway, MEG in fact declared a dividend. Thereafter, Mark amended his complaint to allege that the company wrongly withheld from his dividend share sums that he did not owe the company.

The relief Mark sought in this unjust enrichment claim was payment by the company of the amount of money he was claiming the company wrongly withheld from him when it distributed the dividend it declared in March 2005. Under the analysis approved by the Court of Appeals in *Ver Brycke,* regardless of the label of the claim, and of the traditional categorization of unjust enrichment as an equitable remedy, the essence of the parties' dispute was over the payment (or failure to pay) money, and the relief sought by Mark was compensation for the allegedly wrongly deducted sums. Accordingly, the trial court correctly ruled that Mark, having

properly request a jury trial, was entitled to have a jury decide his unjust enrichment claim.

## III.

*DID THE TRIAL COURT ERR IN DENYING MEG'S MOTION FOR JUDGMENT AND JNOV ON THE UNJUST ENRICHMENT CLAIM ON THE GROUND OF JUDICIAL ESTOPPEL?*

██ At the close of all the evidence, MEG moved for judgment on Mark's unjust enrichment claim, on the ground of judicial estoppel. The court denied the motion. In its JNOV motion, MEG again argued that Mark was barred by the doctrine of judicial estoppel from recovering damages for unjust enrichment.

Specifically, MEG asserted that, in Mark's original complaint, he alleged that in February 2001, the shareholders had agreed, in writing, that a dividend of $950,000 would be declared, but the company failed to do so; and asked the court to enforce that agreement. The very agreement he sought to enforce, however, included a promise by the shareholders, including him, that debts owed to the company would be paid out of the dividend. Ultimately, MEG did declare a dividend, and did pay debts owed to the company out of the dividend. Mark then sought by means of his unjust enrichment claim to recover the amounts deducted from his share of the dividends.

On appeal, MEG argues, as it did below, that under the doctrine of judicial estoppel Mark could not sue for enforcement of an agreement and, after the agreement was performed, sue to recover sums that were withheld from him under the terms of the very same agreement he sought to enforce. It states: "[T]he estoppel result[s] from Mark Mona's having filed *this very lawsuit* to require that [any debts he owed to MEG] ... be prepaid out of dividends." (Emphasis added.)

Mark counters that the doctrine of judicial estoppel is not applicable to the case *sub judice*. We agree.

 "Judicial estoppel is defined as 'a principle that precludes a party from taking a position in a subsequent action inconsistent with a position taken by him or her in a previous action.'" *Dashiell v. Meeks,* 396 Md. 149, 170, 913 A.2d 10 (2006) (quoting *Underwood–Gary v. Mathews,* 366 Md. 660, 667 n. 6, 785 A.2d 708 (2001)). In order for judicial estoppel to apply, three circumstances must be present:

(1) one of the parties takes a factual position that is inconsistent with a position it took in *previous litigation;*

(2) the previous inconsistent position *was accepted by a court;* and

(3) the party who is maintaining the inconsistent position must have intentionally misled the court in order to gain an unfair advantage.

*Id.* at 171, 913 A.2d 10 (citing *Standard Fire Ins. Co. v. Berrett,* 395 Md. 439, 910 A.2d 1072 (2006)) (emphasis added).

Mark's claim in this case—that MEG was unjustly enriched when it deducted his debts from his dividends—is not inconsistent with any position taken in *previous litigation.* Indeed, there was no "previous litigation." Instead of pointing to *previous litigation* in which Mark took an inconsistent position, MEG complains that Mark took inconsistent positions within *this litigation.* Specifically, MEG argues that, at the outset of this case, Mark alleged that MEG was legally obligated to pay a dividend in order to cover any debts he owed to MEG, but that assertion is inconsistent with Mark's later assertion that MEG acted illegally in making deductions from those dividends to cover his alleged debts. As MEG acknowledges, however, any inconsistency in Mark's position occurred within this litigation. Accordingly, the doctrine of judicial estoppel does not apply.

The second circumstance that must be present for the doctrine of judicial estoppel to apply—that the previous inconsistent position *has been accepted by a court*—is also not present in the case *sub judice.* The trial court never had the opportunity to address Mark's initial complaint that MEG was legally obligated to pay out dividends. Before trial, MEG

declared a dividend and deducted the debts it asserted Mark owed form his share, thereby rendering Mark's dividend claim moot. Accordingly, the trial court never even addressed (never mind "accepted") Mark's original allegations.

## IV.

### *Did the trial court err in awarding postjudgment interest from the date of the original judgment and not from the date of the reduced judgment?*

Finally, MEG contends that the court erred in ruling that Mark was entitled to postjudgment interest on the full amount awarded by the jury in its July 7, 2005 verdict from that date until December 19, 2005, when MEG made payment of the $659,211 reduced verdict to Mark. It argues that when the trial court granted its JNOV motion, it eliminated the prior judgment and, accordingly, postjudgment interest only accrued from the date the revised judgment was entered, and not from the date of the original judgment entered on the verdict.

Mark counters that by granting MEG's motion for JNOV only in part, the trial court did not eliminate the jury's verdict in its entirety; instead, it simply used its revisory power to reduce the amount of the judgment. And, with the jury verdict intact but reduced, the trial court properly found that postjudgment interest accrued from the date of the jury verdict, hot the date that the revised judgment was entered.

As a preliminary matter, we consider the statutory provisions governing postjudgment interest. Rule 2–604(b) provides that "[a] money judgment shall bear interest at the rate prescribed by law from the date of entry." Rule 2–601(b) provides that the effective date of entry of a judgment is the date on which the clerk of the court prepares a written record of the judgment. In the case *sub judice* we must decide whether, for purposes of the accrual of postjudgment interest, the "effective date of entry of a judgment" was the day the jury verdict was recorded or the day the circuit court "granted

the JNOV" and reduced the jury's damages award by the amount of the Mona Energy loan.

In contexts that differ slightly from the case *sub judice*, this Court and the Court of Appeals have addressed the issue of what constitutes the date of entry of a judgment under Rule 2–601(b). In *Medical Mutual Liability Insurance Society of Md. v. Davis*, 365 Md. 477, 781 A.2d 781 (2001), the Court of Appeals was asked to decide when postjudgment interest begins to accrue on a money judgment based on a jury verdict when the judgment is subsequently reduced via a remittitur. In *Davis*, the plaintiffs brought a medical malpractice wrongful death and survival actions against a doctor based on alleged negligence in connection with the birth of their son. The jury returned a verdict in favor of the plaintiffs, and six days later, a judgment was entered in the circuit court's docket. Two days after the judgment was entered, the doctor filed a motion for a new trial or, in the alternative, for a remittitur. After a hearing, the circuit court reduced the amount of the judgment subject to the plaintiff's acceptance of the remittitur, and the clerk entered the new judgment on the docket. The plaintiffs accepted the remittitur and the doctor's insurer paid the judgment with postjudgment interest from the date of their acceptance of the remittitur. The plaintiffs subsequently sought postjudgment interest from the date of the original jury verdict.

The Court of Appeals held that, under the circumstances presented in *Davis*, postjudgment interest began to accrue on the date of the original judgment, even though the judgment later was reduced by remittitur. The Court noted that previous postjudgment interest cases stood "for the principle that postjudgment motions or appeals which may cause a money judgment for a plaintiff to lose some aspects of its finality, ordinarily do not have the effect of postponing the accrual of postjudgment interest from the date that the original money judgment was entered." *Davis, supra*, 365 Md. at 486, 781 A.2d 781.

MEG argues that *Davis* is not relevant to the case *sub judice* because it involves a remittitur, not a JNOV, and, unlike a remittitur, a JNOV eviscerates the previous judgment and replaces it with a new judgment. In support, it directs our attention to *Brown v. Medical Mutual Liability Insurance Society of Md.*, 90 Md.App. 18, 599 A.2d 1201 (1992). In *Brown*, the plaintiffs filed a medical malpractice action against a doctor. On November 25, 1986, a jury awarded the plaintiffs $600,000 in damages, and on the same day, the clerk entered the judgment in the docket. On January 20, 1987, the circuit court granted the doctor's motion for JNOV and, on March 2, 1988, this Court reversed the grant of JNOV and issued a mandate entering judgment for the plaintiffs "on the verdict of the jury." The doctor paid the plaintiffs the $600,000 judgment plus postjudgment interest running from March 2, 1988, the date on which this Court issued its opinion. The plaintiffs sought a writ of garnishment on property of the doctor's insurer to collect additional postjudgment interest from the date of entry of the original jury verdict.

In *Brown*, we determined that "a reversal on appeal of a j.n.o.v. is, in effect, a finding that plaintiff's original judgment always existed." *Id.* at 25, 599 A.2d 1201. Accordingly, we held that, under the circumstances in *Brown*, postjudgment interest accrued from the date the original jury verdict was entered.

MEG reasons that if the *reversal* of a JNOV means that the original jury verdict stands and post judgment interest accrues from that date, then the *affirmance* of a JNOV must mean that the original jury verdict is completely eviscerated and the postjudgment interest accrues only from the date of the entry of the JNOV. Accordingly, MEG argues, if this Court affirms the trial court's JNOV decision, we must hold, under *Brown*, that the JNOV completely replaced the original jury verdict, and that postjudgment interest accrues from the date the JNOV was entered, not from the date the jury verdict was entered. While this reasoning is not necessarily flawed, it is not relevant to the case *sub judice*.

 The Court of Appeals has been clear that when determining the date of entry of judgment for the purposes of calculating postjudgment interest, we must evaluate the circumstances on a case-by-case basis, keeping the objective of the postjudgment interest rules in mind. *Davis, supra,* 365 Md. at 484, 781 A.2d 781 (stating "[Md.] Rule 2–604(b) must be applied to various situations in accordance with the purpose of post-judgment interest...."). The Court of Appeals has explained the purpose of postjudgment interest statutory provisions as follows:

The purpose of post-judgment interest is obviously to compensate the successful suitor for the same loss of the use of the monies represented by the judgment in its favor, and the loss of income thereon, between the time of the entry of the judgment ...—when there is a judicial determination of the monies owed it—and the satisfaction of the judgment by payment.

*Carpenter Realty Corp. v. Imbesi,* 369 Md. 549, 559, 801 A.2d 1018 (2002) (quoting *I.W. Berman Prop. v. Porter Bros., Inc.,* 276 Md. 1, 24, 344 A.2d 65 (1975)).

As we noted in Section II, in revising the judgment by eliminating the damages linked to the Mona Energy advances, the trial judge *said* that he was granting the motion for JNOV, in part; however, the judge's decision to reduce the judgment was not based on any of the arguments raised by MEG in its motion for JNOV. Instead, the judge, *sua sponte,* raised the issue of unclean hands, and then reduced the amount of the judgment based on that theory alone. Thus, as we noted in Section II, although the judge *said* that he granted MEG's motion for JNOV, he was actually exercising his broad power under Rule 2–535(a) to revise the judgment.

The case *sub judice* is most like *Davis,* in which a judgment was reduced via remittitur. And, as in *Davis,* in the case *sub judice* the reduction of the judgment did not eviscerate the original judgment. Indeed, the jury verdict remained essentially intact; the circuit court simply reduced the amount of the judgment upon a finding that Mark had come to court with

unclean hands with respect to that part of the award. Accordingly, the trial court did not err in ruling that postjudgment interest accrued from the date of entry of the original judgment.

JUDGMENT AFFIRMED. COSTS TO BE PAID ONE-HALF BY THE APPELLANT AND ONE-HALF BY APPELLEE MONA ELECTRIC GROUP, INC.